Case 24-140, University of Buffalo et al. v. University at Buffalo Student Association, Brian Hamlick, Phyllis Floro et al. Mr. Chandeville? Chandeville, yes. Mr. Chandeville, I understand you would like to reserve three minutes for rebuttal, is that right? Yes, Your Honor. Okay, whenever you're ready. Thank you, Your Honor. I may it please the Court, Chris Chandeville with Alliance Defending Freedom, representing the Young Americans for Freedom and the named plaintiffs. For going on three years now, my clients have been unable to access the mandatory student activity fees that they are otherwise entitled to because they cannot sign a form agreeing to subject themselves to the defendant's unbridled discretion to discriminate against them based on their viewpoint, which has already occurred in this case, and also because they cannot agree to waive their rights to challenge such constitutional violations in court. Today, it is a conservative student group that is being discriminated against based on their viewpoint, but tomorrow it could just as easily be the College Democrats or Students for Justice in Palestine. Allowing our case to proceed will protect all speakers on campus, regardless of their viewpoint. For this reason, we ask the Court to reverse the decision below and remand the case with instructions to grant the preliminary injunction that we requested below. I'd like to begin today, if I could, by talking about our claim that the Student Association and the university defendants are exercising unbridled discretion, and that that unbridled discretion violates my client's constitutional rights and also gives them an entitlement to a preliminary injunction. I'd like to make one threshold point about that claim, and then also, if I could, make four substantive points, which I can take through quickly. There's no dispute, but that we're dealing with a limited public forum, right? Yes, that's correct, Your Honor. This is a limited public forum. And so the standard then is whether the conditions of viewpoint are neutral and reasonable, right? Those are the two main standards. There's a third standard that this court enunciated in the Amidon case, and that third standard is that those restrictions cannot be a quote-unquote facade for viewpoint discrimination. And so as five circuit courts of appeals have already held, when there's unbridled discretion granted to an enforcement official, even in a limited public forum, that does trigger strict scrutiny, again, regardless of the type of forum, because viewpoint discrimination is prohibited, even in a limited public forum. What's the evidence in this record? What are the allegations in this record that we're invited to credit that there was no viewpoint neutrality? So the allegations in the record, first of all, we have an allegation which is not necessary to make out a claim of unbridled discretion, but we actually have proof in this case that there was viewpoint discrimination against my clients in the exercise of the unbridled discretion when the Student Association waited two months to approve the Michael Knowles event, only approving the event three days before it could occur, which led to substantial logistical problems for my clients in planning that event. So let's just pause on that. Yes, Your Honor. Because it seems like the upshot is they approved. They did approve. Your client wanted a speaker, and the association said yes. Your only complaint about that is that it took them too long. It did take them too long. So let's ask this. Do you have evidence in the record, or have you alleged, that this is generally a very efficient association that generally approves things quickly? Or is there no evidence? I mean, what do we have? Are they approving everybody within a day, and for your clients it took longer? So we do have evidence in the record. Their own contracts policy, which is Exhibit 11. Not the contracts policy, but the online form that gives a contract review. Just give me a page maybe in the joint appendix if you want us to look at that. JA-249. 249. One second. Here, let me just get that. And also 248. Okay, 248, 249. This is their policy. So this is related to their contract policy. This is something they have up on their website that all student groups have to access and use in order to get a contract approved. So I'm at 248. This is the thing where it says, be aware the process generally takes two to three weeks, depending on various situational factors. Correct. And how long did it take for this approval? Two months in this case. The approval only happened three days before the event was scheduled to occur. But again, so this is sort of the prediction of how long it usually may take. It is, Your Honor. Is there evidence of how long it in fact generally takes? So we don't have evidence of how long it in fact generally takes. We just have the evidence at this point of how long it took for our clients. Right, so I guess if your argument that your client has been treated differently, right, in a way that's not neutral, that would suggest that other student groups are getting better treatment, right? Because otherwise if we surveyed all the other student groups and it turns out that this happened to be a really poorly managed group of student association that year because, I don't know, the college kids were too busy taking exams, so they were slow, I don't know, and it turns out they all took about two months, what would the impact of that be on your case? So it would not have any impact on our argument that the unbridled discretion allows the student association to engage in covert viewpoint discrimination. All right, but back up. I thought we were still at evidence that this is a facade or that they had been treated poorly. So the facade is the unbridled discretion that is within this policy where they say, well, it would typically take two or three weeks, but then they end up taking two months to improve a particular speaker. Why does that speak to anything other than possible inefficiency? How does that have anything at all to do with viewpoint discrimination? I don't follow that. So the problem, Your Honor, is the Supreme Court has made clear in cases like Forsyth County. This court made clear in the Amidon case. The problem with unbridled discretion is it allows enforcement officials to discriminate based on viewpoint discriminatory reasons, and there's no way to test that discrimination in court because they can always say, well, we had some other factors that weren't set out in the policy that we relied on. We had some other reasons. You can test it all the time, right? I mean, presumably this is not the only club. I assume the University of Buffalo, I don't know how many other clubs there are, and presumably they're getting contracts signed. So you would collect evidence about how, when they submitted their requests and when their contracts were signed. And if it turns out that everybody's took two months because this was a particularly busy year or a very inefficient student council or whatever they are, then the court would or fact finder would conclude, well, there's no that fact. The two-month delay doesn't shed any light on viewpoint neutrality not being there, right? I mean, maybe you have other arguments that the policy on its face gives too much discretion, and there's a danger that they could be treated differently, but the question of whether they were treated differently or in a way that's a facade for neutrality, I don't understand how we make that. There's anything here for anybody to make that assessment if you don't have comparators. So what unbridled discretion case law requires is not comparators to make that assessment. We don't even have to show to bring a facial challenge. We don't even have to show that we've applied for the opportunity to speak and been denied that opportunity. That's the city of Lakewood case that says if there's unbridled discretion given to an enforcement official, you don't have to show that there's been viewpoint discrimination against your client because without a specific set of factors, for example. What unbridled discretion are you talking about? We've got some parameters around the time that the board can take to make these decisions. It made the decision in your client's favor. So I just don't understand. You've got to help me because I do not follow your argument. So I think page 11 of our reply brief is the best place that I can cite the court for what these policies, all of these policies are lacking in terms of bridling the discretion of the enforcement officials here. And there's three things we identify there. I could actually give the court a fourth one. The three things are none of these policies purport to provide an exhaustive list of criteria that the enforcement officials are allowed to look at. None of them say that a request must be approved if these criteria are met. None of them requires the student association to make a decision within a set amount of time. And none of them requires any sort of written explanation for why the decision was made. Those are all factors that this court in Amidon, the field day decision that my friends at the other site, they've all looked at policies that give a complete list of criteria that enforcement officials can rely on that give specific deadlines and say you only have this much time to make a decision. That is what needs to be in place to bridle the discretion to prevent viewpoint discrimination. So to state a claim for unbridled discretion, we don't have to show that we've suffered viewpoint discrimination. We have here because of the Michael Knowles event. That's not a required showing to state a claim for that. And strict scrutiny is triggered as a result. I'd like to leave the unbridled discretion about the current policies and practices aside for a minute and just ask you some questions I had about what exactly happened between June 1, 2023, and July 3rd when the national affiliation ban, as you call it, was revoked. You allege that during that time, which I believe is an interterm time, that you were unable to access fees and reserve space and so on, but your allegations were remarkably generic. And I didn't see any allegation that a particular plan was foiled or that you actually suffered in any way. And that absence of specificity matched my understanding that the student association had not, in fact, removed you from the website or derecognized you. The only thing that had been derecognized was that there had been the statement in the policy change that derecognition would be automatic. But, in fact, the university itself hadn't been advised that your organization was derecognized or that there was any specific way in which you were affected. So it looks to me like the national affiliation ban actually never took effect during that period. Could you address my concern, please? I'd be happy to. So three responses to the concern that Your Honor raises as to the national affiliation ban. The first is as to the question of whether or not we were actually derecognized during that one-month period. My friends on the other side, their own evidence, their declaration from Phyllis Floro, who's the director of student engagement, list a group of student organizations whose status changed during that one-month period. And my clients were on that list. That's at J256 and 353. So they're on a list, a list. But the university itself hadn't been. Did you request access to the fees during that time? So we did not allege that we requested access during the fees during that time. You did not allege that you requested access to space or any other facility that recognition would provide you entitlement to. No, we didn't make that allegation. That occurred during the one month. So that gets to my two other points that I was going to make in response. The first is that we've contended that the derecognition by itself, the change in status of my clients, is enough to constitute a completely constitutional harm. But that's what I'm questioning, in fact, whether there was, in fact, a derecognition, other than the statement in the student association guide that derecognition would be automatic. I don't see any other evidence that you were, in fact, derecognized or disabled from accessing everything that recognized groups could access in that period. Well, again, that's the statement from Phyllis Floro in her declaration. That's at pages 256 and 353 of the record, that they are on the list of groups that were derecognized during that time. And so then my second response was that that derecognition by itself, under Healy, is enough to constitute a completed constitutional violation. And then third, if I could quickly, I'll try. Go ahead, say the third.  And then third, we also contend that under the standard for a 12B6 motion in Lujan, that general allegations encompass more specific allegations that are necessary to support that claim. But I'm correct that you've made no specific allegations that you were denied any of the attributes of a recognized group during that time. We allege that we were denied the opportunity to obtain access to space and funding, et cetera, during that time, but not that we made a request during that time. Okay, thank you.  Thank you very much. You've reserved three minutes. Why don't we hear for, let's see, who's up first? We have Attorney Sagan. Yes, good morning, Your Honors. May it please the Court. Aaron Sagan of Hodgson-Russ Counsel for the University at Buffalo Student Association. I think that there is a reason it is sometimes confusing to follow the claims that the appellants are making in this case. And the reason is that they're actually trying to mix and match pieces of different policies, even sort of lump them together, to fill holes in their arguments for a particular policy. The district court correctly looked at each specific policy that was challenged and determined whether there was a viable claim against that particular policy by reading that particular policy. There was not, and dismissal should be affirmed. I'm glad that the appellants started with the issue of unbridled discretion, right? Because they had to reach all the way over to a different policy, the contracts policy, okay? To say that we think there's unbridled discretion, therefore the viewpoint neutrality test doesn't apply. Well, let's set the contracts policy aside for a second. What about their challenge to the policy we were just talking about, what they refer to as the national affiliation ban? Where in that policy that they're challenging is there unbridled discretion? There isn't any. It prohibits the student organizations from being a chapter of or otherwise affiliated with an outside organization with some exceptions, right? But they're specifically listed. There's no unbridled discretion there. And so, Your Honor, when you ask the question about the viewpoint neutrality test, that is a test that applies. They're taking other policies. What I think they effectively did is they flipped through the bylaws and the policies to find some other policies out there where they think there may be unbridled discretion and sort of mixing it all together and saying, well, there's unbridled discretion out there. Therefore, we have to throw away the viewpoint neutrality test that Martinez and the Supreme Court say applies. That's what applies to the policies here. On the first policy, though, Your Honor, you made the point. We don't even get there because they lack Article 3 standing. They lack it for two reasons. Yes, they seek nominal damages, but they don't have an injury in fact. There has to be a completed violation. Now, they say derecognition. And this is, of course, just assuming that the allegation is correct, that they were derecognized, setting aside the fact that on a 12B1 motion, right, it's not 12B6 on this standing issue, setting aside the fact that we think we have clearly refuted that. But let's accept their allegations as true. These cases don't stand for the proposition that derecognization or alleged derecognization in and of itself is an injury. In all of the cases they cite, which, by the way, I don't think deal with repealed policies, there was an actual completed injury. For example, in the Healy case, the club wanted to hold a meeting at the campus coffee shop. And they couldn't. They were denied recognition. They specifically wanted to do that, and that couldn't happen. We don't have any allegation like that in about the 33 days where the derecognition was allegedly in effect from June 1st of 2023 to July 3rd. The best way I can describe it, and I think the Supreme Court got it exactly right in the, and I'm going to butcher the pronunciation.  I'll let the court's pronunciation stand. I would do worse. That case, the primary takeaway from that case was, look, if you're seeking nominal damages, the mootness doctrine doesn't apply. But it doesn't mean you don't have to show a completed injury, right? And the second footnote in that case, you know, if I could bold it, italicize it, highlight it, I would do that. Here's what it said. Yes, the first plaintiff or petitioner in that case, he, and this was about university policy, right? It was about speech. This particular plaintiff was actually disrupted from speaking on a number of occasions. But there was a second plaintiff that doesn't get talked about much who said, well, I didn't go to the event, right? Or I didn't go to any of these places, and nothing happened. The Supreme Court remanded for him to the district court to determine if there was actually a completed violation, a completed injury. We don't have allegations here of a completed injury. And I think the best comparison is the Allen case from the Sixth Circuit that the court below cited. That was the travel ban, another constitutional case for COVID-19. In that case, the individuals who were suing didn't say, we tried to travel, but we were penalized for doing it. Or we tried to seek an exception from the ban. Or that we had some sincere effort or opportunity, but were chilled from doing it because of that. None of that is there. None of that is here. That should be dismissed. Okay. You guys have divvied up your arguments, so I can't give you the equivalent of 10. No, no. Unless you have some last nugget of wisdom for us. Can I actually just ask, with your permission, one thing I was concerned about is whether, in terms of the contract and relationships with outside organizations, whether your adversary's client would need to have a contract for, like, trademark usage to enable it to proceed with the name as it stands. And whether that kind of contract is the kind that would get approved or that's precluded. Because there's this confusion about all the organizations are actually part of the student association, and they can't have separate relationships. But, in fact, many do. So could you explain to me how that works? To answer that question, I know there was a separate, I think, footnote or sentence in the reply brief about how they had to change their name. That was not something from the student association. I think that was university-driven. But it had to do with a trademark issue. With respect to contracts, though, I want to make one point. I should note that that contract wizard, that page in the record, I think it was like 240, Your Honor, that counsel had directed to you, literally has eight different templates that they encourage the students to use. There are a number of different controls. But I would say we don't even need to get to the contracts policy, because the other main policy that they're challenging, which is the legal status policy, and along with that the acknowledgment form that you're basically just signing, saying you're going to comply with these policies that have existed, they're not going to, and they've said that they won't follow these. Any other claims, and the district court got into this, I think, very eloquently, any other claims against any of the other policies would not redress the harm that they complain of, which is they can't access the funds and they can't access the facilities because they won't sign the form. And there's a case of the form just says that I will comply with these policies and the legal status policy had been in existence well before any of these events in March 2023, right? That is absolutely correct. And I will end on that, Your Honors, unless you have further questions. Thank you. Okay. Thank you very much. Why don't we hear from Attorney Rosenbluth. Good morning, Your Honors. May it please the Court, Sarah Rosenbluth for the University Appellees. Plaintiffs' reply brief, and I think their argument today, confirmed that they do not press any independent claims against the university administrators, nor do they have any qualms with the actual text of the university's recognition policy. Really the crux of their argument on appeal is that the SA's legal status ban compels them to engage in speech and association against their will. But they do not allege that any university administrator is responsible for drafting or implementing the SA's legal status ban. And neither do they develop any argument on appeal that there is anything unconstitutional about the university's own policy. Although they seek an injunction against enforcement of the university's policy, any such injunction would not redress plaintiff's alleged injury, which arises only from the legal status ban. So the Court should therefore affirm the dismissal of plaintiff's claims as against the university administrators. We do nonetheless agree with the SA that the SA's policies are constitutional under the standard set forth in Christian Legal Society v. Martinez. I echo much of what counsel for the SA has already discussed, but I do want to emphasize that this case lacks two key features that have been present in expressive association cases that the Supreme Court has applied heightened scrutiny to. So first, unlike in cases like Boy Scouts v. Dale and 303 Creative, the regulation at issue here does not directly compel plaintiffs to engage in any expressive conduct against their will. At issue in 303 Creative, for example, was a public accommodations law. And that automatically applied to plaintiff as soon as it opened its doors for business in the state of Colorado. If it wanted to run a web design business in state, there was nothing it could do to avoid being subject to the law and thereby being compelled to create websites, expressive websites in support of same-sex couples. Here, by contrast, plaintiff has voluntarily subjected itself to SA policies by choosing to seek recognition by the SA, even though it could instead choose to seek recognition from a number of other entities. Well, but I thought that there are different consequences. I thought if it gets recognition from one of the other entities, it can't get any of the funding. Hang on. Is that a true statement? Not quite, Your Honor. So certainly the undergraduate pool of student activity funds is the largest, but they could get access from the SBA. The Student Bar Association also has a pot of money to divvy up. It's smaller than the undergraduates. But if they have law student members, then they could seek recognition from the SBA. But the Student Association money would be off limits to them. Correct, but the SBA has its own money. They could still get money from a school-recognized entity. But possibly less, you're saying? I don't know. I don't know exactly how that would work. I mean, I think probably, I mean, I don't know. I'm assuming that the undergraduate fund is the largest fund. But there's also just more groups. So I think proportionally it probably would be about the same. I don't exactly know. So the second point that I want to make is that unlike in other cases that plaintiffs rely on, there is no risk that a reasonable observer will erroneously attribute the speech of any SA-recognized group to the Young Americans for Freedom simply by virtue of the fact that both are recognized by the SA. And in fact, I don't allege that that has happened at all. I think it's commonly understood that student groups on campus reflect a diverse range of political viewpoints, hobbies, pursuits. And as the district court here reasoned, no one would think, for example, that just because the college Republicans and the college Democrats are both recognized by the SA, that means that what one says, the other says too. And as the Supreme Court has recognized in Pruneyard, nothing prevents plaintiffs from publicly dissociating from the views that it finds objectionable. At bottom, the policies here, like the policy at issue in Martinez, is reasonable and viewpoint neutral. And the solution to any problem that plaintiffs have with it is simply more speech. For those reasons, we ask the Court to affirm. Thank you very much, Ms. Rosenbluth. Mr. Shentwell, we'll hear from you for an additional three minutes, if there's anything you'd like to add in rebuttal. Thank you, Your Honor. There is. So just three points. First of all, in response to the argument from my friend for the Student Association, they argue that we're mixing and matching different policies here to try to challenge the unbridled discretion. But that goes to the same mistake that the district court made at pages 621 and 643 of the record. And it's really a heads-I-win-tails- I'm sorry to interrupt, but your unbridled discretion argument is focused on the contracts policy? It's focused on everything that the legal status ban encompasses. And so in our Everything that the legal status rule, legal status ban, that you have to be part of the SA, all recognized clubs may not have any accounts or financial activities outside of the SA. And this, as I said earlier, my understanding is that this predates the events and applies equally, the events that you complained of in 2023, and applies to all student organizations, right? That's correct, Your Honor. So there are really two sides of that coin. And if you look at page 228 through 229 of the Joint Appendix, that shows it's not just that clubs cannot be their own legal entity. The other side of that coin is, quote, only the SA itself may enter into contracts, take legal actions, commence litigation, or undertake legal obligations. And so what the legal status ban does is it subjects my clients and all student groups to the SA's unbridled discretion to decide whether or not a club is going to get a contract with an outside group, whether or not a club can do an event. Does that with regard to all recognized student organizations? That's correct, Your Honor, but that shows How does this map into viewpoint discrimination? The same policy applies to everybody. Because it allows for covert viewpoint discrimination, which is exactly What is covert viewpoint discrimination? It's viewpoint discrimination that's not clear on its face. So it's a government official saying, I have these benign neutral reasons for delaying this event until three days before it occurred, not viewpoint discriminatory reasons. And without clear criteria for testing that, there's no way that my clients can prove that it was viewpoint-based. I can't say it any better than the Supreme Court said it. You'd show pretext. You'd come in and say, this evidence is pretext. So we can assert pretext, but until we get to discovery, we can't take the evidence that we would need to support that claim. But I can't say it any better than the Supreme Court said it in the city of Lakewood case. In talking about the problems with this unbridled discretion, the court said there, and this is at page 758, without these clear guideposts, post hoc rationalizations by the licensing official and the use of shifting or illegitimate criteria are far too easy, making it difficult for courts to determine in any particular case whether the licensor is permitting favorable and suppressing unfavorable expression. And that was in what case? The city of Lakewood case from the U.S. Supreme Court. But that wasn't about a student organization operating within the university's walls. It was about a governmental authority exercising statutory regulatory authority. But it's five circuits upheld. Unbridled discretion is unconstitutional, even in a limited public forum like we have here. And secondly, that shows that you don't have to be able to prove that there is past viewpoint discrimination against your client in order to bring a claim based on unbridled discretion. But you seem to be inviting us to find viewpoint discrimination without your having to prove it by just simply alleging that it can be the result of hidden, unarticulated motives. So, again, Your Honor, I can't say it any better than the Supreme Court said in city of Lakewood. This is at page 755 of their opinion where the court wrote, When a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for and being denied a license. But as Judge Carney just pointed out, the case is an apposite. It does not map onto the facts we're dealing with. It's only an apposite if unbridled discretion is permitted in a limited public forum like we have here. Five circuit courts of appeals have already held it is not permitted in a limited public forum like we have here. We would ask this court not to be the one that creates that circuit split. And so if there is – But, you know, you keep pounding the table on this, but we have to be persuaded. That's what I hope to do today, Your Honor. Can I just ask, just so that I'm not mixing and matching your arguments, this argument you're making about unbridled discretion is one that you're raising that could have been raised, I don't know, also three years ago. I'm not suggesting it's beyond the statute of limitations, but it's based on the policy that existed before this whole kerfuffle about this one speaker, right? It is, Your Honor. And my clients didn't have any reason to raise the challenge at the time because it hadn't been enforced against them. It's not an unbridled discretion claim that you're arguing is arising for the first time out of these policies that it's sort of like everyone just noticed it now or for whatever reason. But it's one that's always been lurking there, but no one sued about it yet. It's always been lurking. No one sued about it because it wasn't being enforced previously.  And it's within the legal status ban or the contracts policy or throughout all the policies? It's within the legal status ban, which encompasses the contracts policy. And so the best place is to look for – Only the S.A. itself may enter into contracts. And so that you say they need to write out standards about what kind of contracts they'll enter into. They do have some model contracts, right? Correct. But those model contracts, there's no requirement that those have to be used, that those are the only criteria that can be looked at, or that a decision on a contract has to be made by a specific time. So the best place to look in our complaint for where we allege that the legal status ban encompasses more than just that ban by itself, also these attendant policies is pages 155 through 56 and also page 175 of the joint appendix. And my friends on the other side have conceded in their brief that the legal status ban encompasses other policies like the contracts policy. That's on pages 6 and 12. So you'd like them to enact regulations detailing time periods about how fast the student – would those be the same in the summertime in schools in recess as opposed to in the academic term? It's possible that there could be an objective reason to have different standards in the summertime. But yes, they need to enact very clear, explicit standards for these are the criteria that may be considered. This is how quickly we're going to give you a decision. And you equate the student organization at the University of Buffalo, the students who are passing through and maybe a junior, maybe a senior, to the city elected officials or appointed officials who are running in the city of Lakewood, whatever regulatory regime was enacted by the city council there. Is that right? So I don't think we're trying to equate anyone to anyone else. The only position that we're taking is that unbridled –  The position that we're taking is that unbridled discretion triggers strict scrutiny. And if that can't be met, it violates the First Amendment, even in the context of a limited public forum as five circuit courts of appeals have already held. And for that reason, we don't have to have evidence of past discrimination in order to bring a challenge like the one that we brought here, in order to get preliminary injunctive relief like we need here. And the city of Lakewood case from the Supreme Court is the best case to make that point clear. Can I – this is perhaps an obvious question. Maybe I shouldn't even be asking it. But this is a fight that's revolving a lot about the contracts policy. Correct. Is there anything in these policies that prohibits any student group from inviting a speaker if there's no contract involved? Well, in order to invite a speaker, with the speakers that we engage with, the speakers themselves – No, no, no. I'm talking about other speakers who don't insist on a contract. I don't know. Judges go all the time and we speak at universities. I don't think anybody's ever asked me for a contract. I don't think they'd probably be able to pay me. But, I mean, I don't know. People show up and talk all the time without contracts. My question is, with respect to people who you don't have to pay, is there anything in this policy that prohibits or inhibits a student association, a club, from inviting someone to come talk and having them talk? I don't know if there's anything in the policies that requires a contract. However, it requires – No, no, no. I'm saying is there anything that requires the student association to approve? So, let's say your club or the chess players of Buffalo Club or whatever club they have, they get some famous person to come. He says, yeah, I'd be delighted to speak. Does a club need to get essay approval for that speaker? We think that they would for a couple of reasons. Under what policy? Yeah, just point to what policy. So, the contracts policy. The contracts policy says –  Okay, hang on. My hypothetical is that there's no contract involved. Now, you're going to tell me the contract policy is not – it's a misnomer. It is. Okay, then tell me why. Because they have interpreted contracts, that policy to include not just the contracts themselves, but any agreement that a student group might wish to enter into. So, if my group enters into an agreement with an outside speaker on this day, you're going to come and speak on campus, that agreement is subject to essay approval based on their own interpretation of the contracts policy. In addition to that, in order to be able to reserve space on campus to bring that speaker on campus, they also have to be recognized. They also have to get approval from the student association. So, bringing a speaker – I want to tease that. You said they have to be recognized. You mean as a group? Correct. Okay. But I'm talking, I guess, in my hypothetical, your club is already recognized as a group. So, put that aside. Yes, sir. But you're saying that any time a club acts and someone else who's not in a club acts in conformity with their desires, there's, quote, an agreement that, in your view, constitutes a contract. It's not just my view. It's the student association's own view. That counts as prohibited. It's something that the student association itself has to sign off on. So, they invite somebody who says, I would be delighted to show up tonight and talk. All of a sudden, it's an agreement, and now that requires – Okay. Yes, Your Honor. All right. If there are any further questions, I'm happy to restore my briefs. Thank you to all counsel. Thank you both. Very helpful arguments all around. We appreciate it, and we will take the case under advisement.